IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

BRITTNEY DOFFING, *individually and as next of friend to minor plaintiff M.K.*,

Plaintiffs,

v.

META PLATFORMS, INC.,
SNAP, INC.,

Defendants.

Case No. 1:22-cv-00100-CL

**FINDINGS AND RECOMMENDATION**

---

CLARKE, Magistrate Judge.

Plaintiff brings this case on behalf of herself and her minor daughter for injuries allegedly caused by defendants' social media products. This case comes before the Court on Defendant Snap, Inc.'s Motion to Transfer Venue for lack of personal jurisdiction, or alternatively, pursuant to its forum-selection clause. Defendant Meta Platforms, Inc. did not join the motion but submitted a statement of non-opposition. Oral argument was heard on June 7, 2022, in Medford, Oregon. For the reasons provided below, the Court recommends that the Motion to Transfer Venue (#37) be DENIED.

1 – FINDINGS AND RECOMMENDATION

## BACKGROUND

Plaintiff is a resident of Ashland, Oregon and is the mother and custodial parent of M.K., a minor that also resides in Ashland, Oregon. Defendant Snap, Inc. ("Snap") owns and operates the social media platform known as Snapchat. Snap is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Meta Platforms, Inc. ("Meta") owns and operates the social media platform known as Instagram. Meta is a Delaware corporation with its principal place of business in Menlo Park, CA. According to Plaintiff, M.K.'s use of defendants' products has occurred entirely in Oregon.

M.K. received a smart phone at age fourteen and shortly thereafter opened an account with Instagram and Facebook with her mother's consent. M.K. also opened an account with Defendant Snap, Inc. against her mother's instruction and without parental consent. According to Snap, when M.K. opened her account, she should have been presented with a screen that asks the user to enter a first and last name and then click "Sign Up & Accept." Locascio Decl. ¶ 14. On the screen above "Sign Up & Accept," included the following statement: "By tapping Sign Up & Accept, you acknowledge that you have read the Privacy Policy and agree to the Terms of Service." *Id.* The terms "Privacy Policy" and "Terms of Service" contained within the above statement were hyperlinks that M.K. had to click on in order to access, review, and print the Privacy Policy and Terms of Service. *Id.* ¶ 15.

Snap's Terms of Service consisted of approximately 15 pages and contained a statement relating to a minor's use of the services.

> Who Can Use this Service
>
> No one under age of 13 is allowed to create an account or use the Services. If you are under 18, you may only use the Services with the prior consent of your parent or legal guardian. Please be sure your parent or legal guardian has

>reviewed and discussed these Terms with you before you start using the Services.

Locascio Decl., Ex. 3 at 2. Plaintiff asserts that she did not consent to M.K.'s use of Snapchat, nor did she review or discuss the Terms with her daughter. Doffing Decl. ¶ 6. Plaintiff alleges that Defendant Snap should know because of its collection of data and utilization of algorithms, and because of the filing of this lawsuit, that M.K. is a minor and using Snapchat without parental consent. Yet, M.K. still has access to the multiple Snapchat accounts that she created and continues to receive communication from Snap as of the filling of Plaintiff's Opposition.

Snap's Terms of Service also includes a forum selection clause on or around page 13. The clause is titled "Exclusive Venue" and states,

>To the extent that these Terms allow you or Snap Inc. to initiate litigation in a court, both you and Snap Inc. agree that all claims and disputes (whether contract, tort, or otherwise), including statutory claims and disputes, arising out of or relating to the Terms or the use of the Services will be litigated exclusively in the United States District Court for the Central District of California. If, however, that court would lack original jurisdiction over the litigation, then all such claims and disputes will be litigated exclusively in the Superior Court of California, County of Los Angeles. You and Snap Inc. consent to the personal jurisdiction of both courts.

Locascio Decl. ¶ 23; Ex. 3 at 13-14.

Plaintiff alleges that defendants' products are designed to be used by children and are marketed to children across the United States. Plaintiff alleges that defendants created complex algorithms that are designed to be extremely addicting to minors and that they utilize methods that promote excessive use. These methods include sending text and email notifications to users while they are not using the application, which was allegedly designed to encourage users to re-engage. Plaintiff asserts that Snap sent thousands of notifications and emails directly to M.K.'s phone in Oregon from March 2020 to the present. Other methods employed by defendants to allegedly encourage excessive use include a feature known as "Snap Streaks," which Plaintiff

3 – FINDINGS AND RECOMMENDATION

claims is a highly addictive feature that caused M.K. to "rather run away and put herself in danger than lose her streak." Doffing Decl. ¶ 30.

Plaintiff alleges that within two weeks of opening social media accounts, M.K. displayed no interest in any activity other than viewing and posting on defendants' platforms. Plaintiff alleges that defendants' products caused M.K.'s mental health to suffer, she lost sleep, developed eating disorders, ran away from home to gain access to the platforms, and was taken to a medical facility in Medford, Oregon on three separate occasions after psychiatric episodes triggered by defendants' products. *See* Doffing Decl. Plaintiff further alleges that defendants' products were designed in a way that connected M.K. to adults in her geographic location that she did not otherwise know, and that because of this design feature, M.K. was messaged and solicited for sexual exploitive content on numerous occasions by adult users of Instagram and Snapchat.

Plaintiff alleges there are 1.3 to 1.4 million Snapchat users in Oregon, approximately 240,000 of which are children under the age of eighteen. Based on Snap's reported revenue and Plaintiff's calculations, Plaintiff asserts that Snap generated more than $40 million in 2021 from advertising to only its Oregon users. In Snap's 2021 Annual Report, Snap stated that substantially all of its revenue is generated from third-party advertising on Snapchat. Bergman Decl., Ex. B at 18. Snap describes its advertising program as follows:

> We have invested heavily to build our self-serve advertising platform, which provides automated, sophisticated, and scalable ad buying and campaign management. We offer the ability to bid for advertisements that are designated to drive Snapchatters to: visit a website, make a purchase, visit a local business, call or text a business, watch a story or video, download an app, or return to an app, among others. Additionally, our delivery framework continues to optimize relevance of ads across the entire platform by determining the best ad to show to any given user based on their real-time and historical attributes and activity.

*Id.* at 11. Snap states that it relies heavily on its ability to collect and disclose to its advertisers personal data and metrics collected from its users so that it can attract new advertisers and retain

4 – FINDINGS AND RECOMMENDATION

existing advertisers. *Id.* at 18. According to Snap, "Any restriction, whether by law, regulation, policy, or other reason, on our ability to collect and disclose data and metrics which our advertisers find useful would impede our ability to attract and retain advertisers." *Id.*

Plaintiff alleges that Snap has location targeting features that allows it to suggest other users in the same geographic location and allows advertisers to target specific states and cities or a designated radius from a specific address. Advertisers can then specify the age and gender they want to reach within the specific geographic location. Snap describes in its annual report a feature called "Snap Map" as a "live and highly personalized map that allows Snapchatters to connect with friends and explore what is going on in their local area." *Id.* at 9.

> Snap Map makes it easy to locate nearby friends who choose to share their location, view a heatmap of recent Snaps posted to Our Story by location, and locate local businesses. . . . Snapchatters [may] take direct actions from Snap Map, such as sharing a favorite store, ordering takeout, or making a reservation.

*Id.*

Plaintiff asserts claims of strict liability based on defendants' defective design of their social media products and failure to provide adequate warnings of the potential dangers arising from foreseeable use. Plaintiff also brings claims of common law negligence, sexual discrimination by a place of public accommodation, and violations of 47 U.S.C. § 1595 based on defendants' alleged financial benefit garnered from knowingly assisting and facilitating sexual solicitation and exploitation of minor children.

## DISCUSSION

Snap moves this Court to transfer venue to the Central District of California under 28 U.S.C. § 1631 for lack of personal jurisdiction, or alternatively, under 28 U.S.C. § 1404(a), pursuant to its forum-selection clause.

5 – FINDINGS AND RECOMMENDATION

I. **The Court finds specific personal jurisdiction over Snap.**

Whether a court can exercise personal jurisdiction over a nonresident entity depends on whether jurisdiction is permitted under the forum state's long arm statute and is consistent with constitutional due process. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Oregon's long-arm statute confers jurisdiction to the extent permitted by due process. *Triangle Fabricators, Inc. v. Forward Indus., Inc.*, 866 F. Supp. 467, 471 (D. Or. 1994) (citing *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir.1990)). The two forms of personal jurisdiction that a court may exercise over a nonresident defendant are general jurisdiction and specific jurisdiction." *Boschetto*, 539 F.3d at 1016. General jurisdiction is not applicable here, so the Court turns to specific jurisdiction.

A court may have specific personal jurisdiction if the defendant has had certain minimum contacts with the forum state, the controversy arose out of those contacts, and if the exercise of jurisdiction is reasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-74 (1985). A business entity defendant must have purposefully availed itself of the privilege of conducting business activities within the forum state through such minimum contacts that it can reasonably anticipate being haled into court there, without offending traditional notions of fair play and substantial justice. *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). Personal jurisdiction over a defendant who "purposefully directs" its activities at residents of a forum is allowable, even in the "absence of physical contacts" with the forum. *Burger King*, 471 U.S. at 476. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden v. Fiore*, 571 U.S. 277, 290 (2014).

To evaluate purposeful direction of activity towards a forum state, courts in the Ninth Circuit apply the three-part test from *Calder v. Jones*, 465 U.S. 783 (1984). Under *Calder*, a defendant "must have (1) committed an intentional act, which was (2) expressly aimed at the forum state, and (3) caused harm, the brunt of which is suffered and which the defendant knows is likely to be suffered in the forum state." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006).

Plaintiff has satisfied the first prong. Defendants acted intentionally when they entered into contracts with M.K., a minor that resided in Oregon and that used defendants' products exclusively in Oregon. As for the second prong, the Court finds that Snap purposefully directed its conduct towards Oregon residents in Oregon. In the specific context where the defendants own and operate a website, several courts have found that merely operating a website that is accessible from the forum state is insufficient on its own to subject a defendant to personal jurisdiction. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 951 (N.D. Cal. 2017) (rejecting plaintiff's theory that the operators of healthcare websites expressly aimed their conduct at California by sending users' sensitive medical communications to Facebook every time a user sent a request to the health care website). *Blocker v. Black Entm't TV, LLC*, 2018 U.S. Dist. LEXIS 134507 at *22 (D. Or. June 26, 2018) (finding no purposeful direction where the plaintiff failed to allege a connection between the website's use in the forum and the injury suffered). However, in this case, Plaintiff has sufficiently shown that Snapchat is more than mere interactive website that Oregonians are simply logging onto to access a service or buy a product. Snapchat is a highly sophisticated product that has been purposefully distributed to Oregon residents in the State of Oregon, where it is used as a means to maintain almost constant

7 – FINDINGS AND RECOMMENDATION

communication with Oregon residents and also collect and distribute Oregonian's personal information.

Snap has entered into contracts with thousands[1] of Oregon residents. Snap sent thousands of text messages and emails to M.K. in Oregon, and likely sends thousands of similar communications to its other Oregon users. Snap works with Oregon businesses to provide location-specific services targeted directly at Oregon residents. Snap tracks Oregon residents by their location and monitors how they use the product so that it can recommend new connections, products, or activities in order to increase user engagement. Snap also relies heavily on its ability to collect and disclose to its advertisers the personal data and metrics collected from Oregon residents, including M.K. Snap stores and utilizes incredible amounts of personal information from every Oregon user in a manner and to a degree that jurisdictional jurisprudence could not have imagined as little as ten years ago. To find that Snap did not purposefully avail itself of the privileges of conducting business activities within Oregon while Snap maintains near constant communication with Oregonians and continues to mine Oregonian's data would be contrary to the notions of fair play and substantial justice and would potentially impede on the Oregon Legislature's ability to protect Oregonians from the harms alleged in this lawsuit.

To be clear, the Court is limiting this opinion to Snap's conduct towards Oregon and Oregon residents. The Court does not find that Snap has purposefully directed its conduct to every forum where Snapchat is used.

Finally, Plaintiff has sufficiently alleged facts to satisfy the third prong of the *Calder* test. As a result of using Snap's allegedly defective product, M.K. allegedly became addicted to the product and was harmed in Oregon. For these reasons, the Court finds that Snap purposeful

---

[1] Plaintiff alleges that Snap has contracted with approximately 1.3 million Oregon residents.

directed its activities to Oregon residents in the State of Oregon to the degree that exercise of jurisdiction in Oregon is reasonable.

## II. Snap's forum selection clause is unenforceable against M.K.

As an alternative to its personal jurisdiction argument, Snap moves for transfer pursuant to its forum selection clause contained in its Terms of Service.

When a case is subject to a valid forum-selection clause, the Supreme Court of the United States held that the clause should be given controlling weight in all but the most "exceptional cases." *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 63 (2013). However, a district court may not rely on the forum-selection clause until it has decided that the clause was a valid contractual term. *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 518 F.3d 1120, 1124 (9th Cir. 2008). To determine whether a forum selection clause is valid, federal courts "should apply ordinary state law principles that govern the formation of contracts." *See, e.g., Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

A plaintiff may overcome the presumption that a contract provision is valid and enforceable by raising "generally applicable [state law] contract defenses, such as fraud, duress, or unconscionability." *JPaulJones, L.P. v. Zurich Gen. Ins. Co. (China) Ltd.*, 533 F. Supp. 3d 999, 1005 (D. Or. 2021) (citing *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1268, 1287-88 (9th Cir. 2006)). Under Oregon law, a contract is not enforceable if it is contrary to law or against public policy. *Compton v. Compton*, 187 Or.App. 142, 145 (2003). Such law and public policy may be found in legislative enactments, administrative regulations, or the constitution. *Id.*

Under Oregon law, unconscionability is a question of law that must be determined based on the facts in existence at the time the contract was made. *W. L. May Co., Inc. v. Philco-Ford*

9 – FINDINGS AND RECOMMENDATION

*Corp.*, 273 Or. 701, 707 (1975). In assessing a claim of unconscionability, Oregon courts consider both procedural and substantive unconscionability, but "only substantive unconscionability is absolutely necessary.'" *Chalk v. T-Mobile USA, Inc.*, 560 F.3d 1087, 1093 (9th Cir. 2009) (citations omitted) ("[I]f the terms of the agreement are unreasonably favorable to T–Mobile, the agreement may be unenforceable despite its lack of procedural unconscionability.").

Moreover, contracts executed by a minor may be disaffirmed by the minor during minority or upon reaching majority. *See Pettit v. Liston*, 97 Or. 464, 469-70 (1920). While courts have grappled with the issue of compensation when a minor disaffirms, they have upheld the common principle that a minor will not be bound by a contract that she entered into during infancy. In *Pettit*, the Oregon Supreme Court held that an infant who disaffirmed a contract for the purchase of a motorcycle could not recover from the seller the amount paid without compensating the seller for the use and depreciation of the motorcycle while it was in the infant's possession. *Id.* at 469-70. At no point did the court indicate that the minor was prohibited from withdrawing from the contract, nor did the court discuss hypothetical situations in which a minor would be prohibited from withdrawing. The court also explained that "if there has been any fraud or imposition on the part of the seller, or if the contract is unfair, or any unfair advantage has been taken of the minor in inducing him to make the purchase, then a different rule would apply. And whether there had been such an overreaching on the part of the seller would always, in case of a jury trial, be a question for the jury." *Id.*

In this case, the Court finds the forum selection clause invalid because it is procedurally unconscionable, substantively unconscionable, and unenforceable against a minor. The forum selection clause is procedurally unconscionable because it was contained within a contract that

10 – FINDINGS AND RECOMMENDATION

M.K. perhaps did not even open, much less had an opportunity to negotiate. M.K. purportedly agreed to Snap's forum selection clause when she clicked "Sign Up & Accept" on Snap's login screen that incorporated Snap's Terms of Service with the sentence "By tapping Sign Up & Accept, you acknowledge that you have read the Privacy Policy and agree to the Terms of Service." The words "Terms of Service" contained within the statement was a hyperlink that M.K. had to click on in order to access and review the Terms of Service. *See* Locascio Decl. ¶¶ 13-14. The forum selection clause was located on page 13 or 14 of the Terms of Service. It is undisputed that M.K. was fourteen years old when she clicked "Sign Up & Accept" to create her first Snapchat account. There is no evidence of a mechanism that required M.K. to open the Terms of Service before clicking "Sign Up &Accept." Nor is there any evidence indicating that M.K. actually did click on the hyperlink to the Terms of Service. The Court finds it unlikely that a minor acting without parental consent or guidance actually opened and read the Terms of Service. If she did open the Terms of Service, the Court finds it even less likely that she read all the way to the forum selection clause on page 13.

The clause is also substantively unconscionable because M.K. is a minor. Snap's Terms provide that "If you are under 18, you may only use the Services with the prior consent of your parent or legal guardian. Please be sure your parent or legal guardian has reviewed and discussed these Terms with you before you start using the Services." Locascio Decl., Ex. 3 at 2. Plaintiff asserts that she never gave her parental consent to M.K. to use Snapchat, nor did she review or discuss the Terms with M.K. before M.K. started using Snapchat. Plaintiff has continued to communicate her lack of consent through the filing of this lawsuit, and M.K. is still under the age of 18. Snap should be aware by now that M.K. is using the application without parental consent, and yet, Plaintiff alleges that M.K. continues to have access to her account and continues to

11 – FINDINGS AND RECOMMENDATION

receive communication from Snap even up to the filing of Plaintiff's Opposition. Therefore, it seems that Snap is asking this Court to enforce a contract that Snap itself is reluctant to enforce.

Plaintiff argues that "seeking to bind M.K. to the terms of a 15-page document incorporated by reference through a 'Sign up and Accept' screenclick is a quintessential example of a minor being 'overreached.'" Pltf's Opposition. This Court agrees. In contrast to *Pettit*, where the seller acted in good faith and suffered a financial loss when the minor disaffirmed, Snap allegedly derived a financial benefit from M.K. by collecting her data for use and distribution to advertisers while M.K. became addicted to social media to the point of hospitalization. Under Oregon law, Plaintiff, in her capacity as M.K.'s parent and guardian, is entitled to disaffirm any contracts defendants claim to have consummated with her minor child. For these reasons, Snap's alternative motion to transfer venue pursuant to its forum selection clause should also be denied.

## RECOMMENDATION

For the foregoing reasons, Snap's Motion to Transfer Venue (Dkt. #37) should be DENIED. This Findings and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. *See* Fed. R. Civ. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this 20 day of July, 2022.

MARK D. CLARKE
United States Magistrate Judge

12 – FINDINGS AND RECOMMENDATION